**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

EDDIE SERRATO,

     Defendant – Appellant.
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

SOTERO NEGRETE,

     Defendant – Appellant.

No. 12-8040

No. 12-8041

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. Nos. 1:11-CR-00193-NDF-1 and**
**1:11-CR-00193-NDF-5)**
_____

Ronald G. Pretty, Cheyenne, Wyoming for Appellant Eddie Serrato.

James H. Barrett, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, Interim, with him on the briefs), Cheyenne, Wyoming, for Appellant Sotero Negrete.

Jason M. Conder, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, with him on the brief), Lander, Wyoming, for Appellee.

_____

Before **GORSUCH** and **BALDOCK,** Circuit Judges, and **JACKSON**[*]**,** District Judge.

_____

**JACKSON,** District Judge.

_____

Eddie Serrato and Sotero Negrete are drug dealers. In this case they both were found guilty of multiple counts related to their involvement in a methamphetamine trafficking conspiracy centered in Casper, Wyoming. On appeal, Mr. Serrato raises four challenges to his conviction and sentence: (1) the prosecutor engaged in misconduct that violated his Fifth and Sixth Amendment rights; (2) there was an unconstitutional variance between the crime charged (a single conspiracy) and the evidence presented at trial (two separate conspiracies); (3) the district court abused its discretion in its calculation of his offense level under the federal sentencing guidelines;[1] and (4) the district court erred in denying his motion to suppress evidence obtained from a traffic stop that constituted an unconstitutional seizure under the Fourth Amendment. Mr. Negrete raises arguments one and two above and adds that the evidence was insufficient to support his conviction of using or carrying a firearm in furtherance of a drug trafficking crime.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*]The Honorable R. Brooke Jackson, United States District Judge for the District of Colorado, sitting by designation.
[1] U.S. Sentencing Guidelines Manual (2013) [hereinafter "Guidelines"].

2

# I. BACKGROUND

## A. Factual Background.

The somewhat complicated story that led to the defendants' convictions began in 2009 when Wyoming law enforcement began to scrutinize the activities of Mr. Negrete as a possible distributor of methamphetamine in Casper. During the next two years law enforcement kept track of Mr. Negrete through physical and video surveillance, authorized wiretaps, undercover work, controlled buys, and other means. This investigation revealed that Mr. Negrete was redistributing methamphetamine obtained from sources in Utah and Washington, namely, Eddie Serrato from Utah and Oscar Cervantes (who was charged but pleaded guilty in the case) from Washington. We will leave further discussion of the facts to our discussion below of the issues raised on appeal.

## B. Procedural Background.

On July 22, 2011, Mr. Negrete and Mr. Serrato were charged in a multi-count, multi-defendant indictment. Both defendants pleaded not guilty. The defendants subsequently filed various pretrial motions, including a motion to suppress by Mr. Serrato challenging the constitutionality of an April 6, 2011 traffic stop, which the district court denied.

The combined trial against Mr. Serrato and Mr. Negrete, conducted between March 7 and 15, 2012, resulted in Mr. Serrato's conviction on two counts: conspiracy to

3

possess with intent to distribute and to distribute methamphetamine; and attempt to possess with intent to distribute and aiding and abetting the distribution of methamphetamine. Mr. Negrete was convicted on the same two counts plus nine others including conspiracy to launder money; the use and carrying of a firearm in furtherance of a drug trafficking crime; distribution of methamphetamine; possession with intent to distribute methamphetamine; and being a felon in possession of a firearm. He was acquitted on one count of possession of a firearm in furtherance of a drug trafficking crime.

The court subsequently held sentencing hearings on May 24, 2012. The government had filed, prior to the trial, notice of its intent to seek enhanced sentence penalties pursuant to 21 U.S.C. § 851. The recommended imprisonment range under the Guidelines for both defendants was 360 months to life in prison. The court sentenced Mr. Negrete to 360 months and Mr. Serrato to 300 months, each sentence to be followed by 10 years' of supervised release, plus fines and special assessments.

## II.    DISCUSSION

We address in turn the two issues raised by both defendants followed by the two additional issues raised by Mr. Serrato and the one additional issue raised by Mr. Negrete.

### A. Prosecutor's Comments.

Both defendants challenge as prosecutorial misconduct two separate remarks made by government counsel during trial—one in the course of making an objection during the defendant's cross-examination of Drug Enforcement Administration Special Agent Ryan

4

Cox (as to which the district court denied a motion for a mistrial), and the other in counsel's rebuttal closing argument (as to which the court denied defendants' objections). They contend that the misconduct violated their constitutional rights under the Fifth and Sixth Amendments.

The denial of a motion for a mistrial based upon prosecutorial misconduct is generally reviewed for abuse of discretion. *United States v. Harlow,* 444 F.3d 1255, 1265 (10th Cir. 2006); *United States v. Gabaldon,* 91 F.3d 91, 94 (10th Cir. 1996). However, we recently held that when a defendant objects to a prosecutor's remark but does not move for a mistrial, and the district court erroneously overrules the objection, our standard of review is whether the error was harmless beyond a reasonable doubt. *United States v. Begay,* No. 12-2202, 2013 WL 6671208, at *7 (10th Cir. Dec. 19, 2013) (citing *United States v. Pulido-Jacobo,* 377 F.3d 1124, 1134 (10th Cir. 2004). Under either standard we first consider whether the prosecutor's conduct was in fact improper. If so, we examine whether any error committed by the district court in responding to the misconduct was harmless. In the latter regard we consider "the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." *United States v. Martinez-Nava,* 838 F.2d 411, 416 (10th Cir. 1988).

Turning to the first incident, during cross-examination of Special Agent Cox defense counsel asked whether the government had intercepted phone calls involving Mr. Serrato other than recordings from jail calls. Special Agent Cox responded that he believed they did have other such recordings. When defense counsel asked whether Agent Cox would play the recording, Agent Cox responded "I didn't prepare it today."

5

Serrato App. Vol. III at 902. Defense counsel began to respond, "So you just believe --",

at which point government counsel interrupted with a speaking objection: "Your Honor,

I'm going to object now. Counsel has every bit of discovery. If counsel wants to play a

recording, he can play it. It's not Mr. Cox's responsibility to bring the recordings for Mr.

Pretty [Defendant Serrato's attorney]. He's got them in discovery." *Id.* at 902–03.

Mr. Serrato's attorney then asked for a sidebar and moved for a mistrial on the

basis that any insinuation that Mr. Serrato needed to put on evidence violated his Fifth

Amendment right to remain silent. Mr. Negrete's attorney joined in the motion. The

district court denied the motion for a mistrial. After noting that the court understood

government counsel's comment to mean that "the defendants can access the material and

play it and it wasn't this witness' obligation to bring all of the production associated with

this case," the court indicated that it would instruct the jury, similarly to previous

admonitions, that the defendants "have no burden even to cross-examine witnesses, let

alone to produce or play or put forward evidence of any kind because they have no

burden whatsoever in the case." *Id.* at 904.

Both defense lawyers responded that such an instruction would not cure the

violation. Mr. Serrato's counsel requested, as an alternative if the court denied the

mistrial motion, that the court admonish the government in front of the jury. The court

stood by its ruling, stating that the comment did not rise to the level of admonition or

criticism of counsel. Then, immediately following the sidebar, the court instructed the

jury as follows:

6

I did want to make sure the jury is clearly and well instructed that the defendants in the case have no burden of proof whatsoever. The entire burden of proof throughout the entire course of the trial rests on the shoulders of the Government and that proof is proof beyond a reasonable doubt. The defendants not only have no obligation or burden to come forward and testify or tell their side of the story, defense counsel need not even cross-examine Government witnesses or seek to impeach Government witnesses. They do so to bring forward evidence and facts that the jury may consider, but they have no burden of proof whatsoever. And so any suggestion or inference that the defendants have information that they should play or if they have it, they should bring it forward is an improper inference. They have no burden of proof whatsoever. The burden from the beginning through the entire course of the trial rests on the shoulders of the Government.

*Id.* at 905–06.

The second challenged remark occurred during the government's rebuttal closing argument. The defense called into question the veracity of the testimony of a confidential informant that Mr. Negrete had pointed a gun at him. The informant had described the incident to Special Agent Craig Malone of the Wyoming Division of Criminal Investigation. Counsel for Mr. Negrete argued that, according to the informant's testimony, when the informant reported the incident to Special Agent Malone, he seemed disinterested. Counsel also commented that after the informant so testified, the government had not recalled Special Agent Malone to confirm the informant's testimony despite the government's reliance on this "important event." Serrato App. Vol. III at 988–89. Counsel stated, "[i]f a witness is available and he isn't recalled for particular testimony or testimony in general, you can assume the testimony would not be favorable." *Id.* at 989.

7

In his rebuttal, government counsel responded: "If you remember, these defense counsel had an opportunity to ask Agent Malone whatever they wanted. They never asked him—" *Id.* at 1008. Counsel for Mr. Serrato interrupted with an objection. Mr. Negrete's counsel immediately joined the objection, stating, "That's prosecutorial—as instructed, no defendant has any obligation to present a single piece of evidence or a single question. We make those decisions. They are our cases, not the Government's. It is misconduct to even suggest that to the jury." *Id.* The court responded: "Thank you, Mr. Barrett. I believe I've adequately instructed the jury on this subject concerning the defendants' obligation. They have no obligation to cross-examine, even cross- examine to impeach. With that noted, the objection is overruled." *Id.*

The government argues that the first comment was not improper because the jury would have, by virtue of the complexity and length of the trial, understood the process and purposes of discovery. Additionally, the government argues that both comments, when viewed in context, did not shift the burden of production and proof. The government alternatively argues that even if the comments were improper, they minimally impacted the course of the trial; and that limiting instructions given by the court cured the impropriety.

We decline to speculate that the jury would have understood the legal process of discovery so well as to make the first comment completely innocuous. And we agree that the remarks might have impermissibly suggested that the defendants bore, however slight, a burden of production. We assume without deciding that the government

counsel's comments were improper. Nevertheless, despite the impropriety, we do not view the comments in a vacuum when determining whether they warrant reversal.

Here, following the sidebar during which defense counsel moved for a mistrial based upon the first improper remark, the district court immediately and specifically gave the jury a curative instruction. The instruction was both a general reminder of the parties' respective burdens (and lack thereof) and a specific, tailored instruction that any suggestion that the defendants had information that they should play or bring forward was improper. As such, it amounted to an admonishment of government counsel as well as a curative instruction. Moreover, "[w]e presume jurors will remain true to their oath and conscientiously follow the trial court's instructions." *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992). In short, we find no abuse of discretion in the district court's manner of addressing the comment. The court's instruction to the jury was also consistent with later instructions that reiterated the defendants' right to remain silent, the burden of proof, and that the arguments and objections of counsel are not evidence.

As for the prosecutor's comment during his rebuttal argument that the defendants could have asked Agent Malone questions if they had wanted to, we think—from the perspective of an appellate court that has the benefit of time and hindsight—that sustaining the objection rather than overruling it would have been the better course. Instead of sustaining the objection, the court elected immediately to remind the jury that the defendants "have no obligation to cross-examine, even cross-examine to impeach." We do not view that manner of responding to the objection as an error of constitutional significance, but even if it were, we would not hesitate to conclude beyond a reasonable

9

doubt, especially in light of the court's repeated explanation and emphasis on the correct standard, that the error was harmless.

**B. Variance.**

The government charged defendants Serrato and Negrete—along with four co-defendants—with conspiring to possess with intent to distribute, and to distribute, 50 grams or more of actual methamphetamine. Defendants argue that the government failed to prove at trial the existence of one single conspiracy as charged in the indictment, resulting in a fatal variance between the charge and the evidence. Rather, defendants contend, the government only proved two separate but not interdependent conspiracies—one in each state, with Mr. Serrato as the Utah supplier and Mr. Cervantes as the primary Washington supplier.

"A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008). However, "not every variance requires reversal." *United States v. Windrix*, 405 F.3d 1146, 1153 (10th Cir. 2005). A "variance is reversible error only if it affects the substantial rights of the accused." *United States v. Ailsworth*, 138 F.3d 843, 848 (10th Cir. 1998).

This Court thus faces two questions. "First, was there sufficient evidence to support a finding of the single conspiracy charged, or was there a variance? Second, if there was a variance, was that variance substantially prejudicial to Defendants?" *Windrix*, 405 F.3d at 1153.

10

To prove the charged conspiracy, the government bore the burden to show: "(1) that two or more persons agreed to violate the [methamphetamine trafficking laws], (2) that the defendant[s] knew at least the essential objectives of the conspiracy, . . . (3) that the defendant[s] knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *Carnagie*, 533 F.3d at 1238 (quoting *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007)). Interdependence requires that a defendant's actions "facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole." *Id.* (quoting *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992)). Interdependence also requires "proof that the conspirators intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *United States v. Heckard*, 238 F.3d 1222, 1231 (10th Cir. 2001) (emphasis in original; alterations and internal quotation marks omitted).

"Distinguishing between a single, large conspiracy and several smaller conspiracies is often difficult; we will generally defer to the jury's determination of the matter." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009). Despite this deference, however, "we may not uphold a conviction obtained by piling inference upon inference . . . . The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." *Id.* (quoting *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999)).

Here, the government argues that the co-conspirators between both the Utah and Washington rings shared a common goal in the "criminal objective of selling large quantities of drugs." Appellee Br. 28 (citing *United States v. Roach*, 164 F.3d 403, 412

11

(8th Cir. 1998)). We agree with the defendants that the sale of drugs "is 'common' to *every* drug conspiracy, large or small, and single or multiple," Serrato Reply Br. at 2 (emphasis in original). But here there was evidence of more specific overlap among the participants.

Mr. Serrato (the Utah supplier) and Mr. Cervantes (the Washington supplier) were aware of each other's roles in providing methamphetamine to Mr. Negrete. Mr. Cervantes testified that he delivered methamphetamine to Mr. Negrete in Casper on at least 15 occasions. He saw Mr. Negrete sell methamphetamine that did not come from him (Cervantes), and on one occasion he went along when Mr. Negrete collected money from the sale of methamphetamine that did not come from him. Sometimes he was paid with money that Mr. Negrete received from selling methamphetamine that did not come from him. More specifically, Mr. Cervantes testified that he sold methamphetamine that was supplied to Mr. Negrete by Mr. Serrato. He did acknowledge that he only met Mr. Serrato one time. On that occasion Mr. Cervantes walked in on Mr. Negrete and Mr. Serrato at Mr. Negrete's home and found them discussing drug quantities and prices. Mr. Cervantes observed several bundles of methamphetamine in the room. Upon discovering Mr. Cervantes' presence, Mr. Serrato left the room. Mr. Negrete then told Mr. Cervantes that his services were no longer needed because Mr. Serrato was his new source. Mr. Cervantes nevertheless helped Mr. Negrete weigh the methamphetamine that Mr. Serrato had brought, and he and Mr. Negrete tried (smoked) a sample of it together. Serrato App. Vol. III at 439-54.

These actions, particularly providing assistance to Mr. Negrete in selling methamphetamine provided by Mr. Serrato, were acts in furtherance of "the shared objective of distributing drugs received from a common source." *Cf. United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998) (holding that the district court did not err by refusing to give a multiple conspiracy instruction). The defense argues that a single "gratuitous" act by Mr. Cervantes' cannot suffice to establish the single conspiracy. Serrato Reply Br. at 2. We disagree. Even a one-time act will suffice if the "nature and objectives" of that conduct contributed to the larger conspiracy. *United States v. Hamilton*, 587 F.3d 1199, 1209 (10th Cir. 2009) (holding that a "one-time agreement to assist in a one-time collection of money" was sufficient to establish interdependence where it "was calculated to, and in fact did (albeit not to the fullest extent), meaningfully contribute to the success of [the larger] drug operation").

The evidence before the jury was substantial enough to allow it draw the conclusion that there existed "an ongoing, facilitative relationship between parties who were aware of the scope of one another's activities." *Roach*, 164 F.3d at 412. There is no evidence, as the defense suggests, that this single act was "gratuitous" or driven by any other motivation than to aid Mr. Negrete's drug trafficking scheme. *Cf. Caldwell*, 589 F.3d at 1332 (finding no interdependence where introduction of alleged co-conspirators was "friendly rather than conspiratorial").

Accordingly, we find no reason to depart from our general deference to the jury's determination in this case. We hold that the evidence was sufficient to support the jury's conviction on the single conspiracy as charged. Because there was no improper variance,

13

we do not reach the second question of whether a variance substantially prejudiced the defendants.

### C. **Guidelines Calculation.**

Mr. Serrato appeals the district court's calculation of his offense level under the Guidelines, arguing that a two-level increase for offenses involving the importation of methamphetamine should not have been applied. We review de novo any legal questions in a district court's application of the Guidelines, and we review any relevant factual findings for clear error, "giving due deference to the district court's application of the guidelines to the facts." *United States v. Maestas*, 642 F.3d 1315, 1319 (10th Cir. 2011) (quoting *United States v. Doe*, 398 F.3d 1254, 1257 (10th Cir. 2005)).

The Revised Presentence Investigation Report ("PSR") determined that Mr. Serrato's base offense level under § 2D1.1(a) of the Guidelines was 38, but that it should then be increased two levels for the importation of methamphetamine under § 2D1.1(b)(5).[2] The PSR also determined that a three-level upward adjustment was appropriate due to Mr. Serrato's management role per §3B1.1(b) (manager or supervisor of criminal activity involving five or more participants), bringing his adjusted offense level to **43**. Serrato App. Vol. II at 128. Mr. Serrato fell within a criminal history

---

[2] The complete section states: "If (A) the offense involved the importation of amphetamine or methamphetamine or the manufacture of amphetamine or methamphetamine from listed chemicals that the defendant knew were imported unlawfully, and (B) the defendant is not subject to an adjustment under § 3B1.2 (Mitigating Role), increase by 2 levels. Guidelines § 2D1.1(b)(5). There is no evidence of the importation of source chemicals, nor does the mitigating role exception apply.

14

category of III.  *Id.* at 129.  The combination of the adjusted offense level 43 and criminal history category III generated a guideline "range" of a life sentence.  *Id.* at 132.

Mr. Serrato does not dispute the initial base level of 38.  And, contrary to the PSR, the district court found that two levels rather than three would be added for Mr. Serrato's role in the conspiracy under Guidelines § 3B1.1(c) (organizer, leader, manager or supervisor in criminal activity other than described in subsections (a) or (b)).  Mr. Serrato does not, of course, dispute that modification which worked to his benefit.  Because of that modification, the district court determined that the adjusted offense level was **42**.  That offense level and Mr. Serrato's undisputed criminal history category of III generated a guideline range of 360 months to life imprisonment.

As mentioned, Mr. Serrato does dispute the district court's inclusion of the two-level importation increase.  But, if that increase were omitted, bringing the offense level from 42 as determined by the district court down to **40**, the guideline range does not change – it still is 360 months to life.  Guidelines, Sentencing Table.  In short, whether the district court erred by applying the two-level importation enhancement makes no difference to the resulting guideline range.

The district court started at the bottom of the guideline range.  Then it determined that a variance downward to a below-Guidelines sentence of 300 months was appropriate based on Mr. Serrato's current age and the court's view that a below-Guidelines sentence was sufficient to reduce the likelihood of re-offense at the age Mr. Serrato will have reached on release.  Serrato App. Vol. III at 1080-81.

15

Mr. Serrato suggests in his reply brief that the district court might have made an even greater downward variance had the importation enhancement not been applied. At best this is pure speculation, and we are not persuaded. Considering the guideline range and other relevant sentencing factors separately is entirely appropriate. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 53 (noting that determining the guideline range and then picking a precise sentence are two separate inquiries). The factors on which the variance was based remain the same regardless whether the importation enhancement was applied. We conclude that even if the district court erroneously included the importation enhancement in its calculation of the offense level—which we neither reach nor decide— the error would be harmless.[3]

## D. <u>Denial of Motion to Suppress</u>.

Mr. Serrato challenges the district court's denial of his motion to suppress evidence obtained from a stop of his vehicle on April 6, 2011. Mr. Serrato argues that the stop was an unreasonable seizure under the Fourth Amendment.

---

[3] We do note that the only argument that Mr. Serrato develops in his opening brief—that the importation guideline improperly implements 21 U.S.C. § 865—entirely misses the mark. That statute concerns smuggling methamphetamine while using facilitated entry programs. 21 U.S.C. § 865(a), (b). Mr. Serrato was never charged with violating that statute. There is indeed a guideline, § 2D1.1(b)(**6**), which provides a two-level increase for individuals convicted under the statute. But that guideline was not applied here, perhaps explaining the government's silence on this argument in its response. We suspect that the argument might have resulted from confusion in the numbering scheme. Guideline section § 2D1.1(b)(**5**), which was applied here, formerly was numbered (b)(4). Section (b)(**6**) formerly was (b)(5). In the district court, and in his reply brief on appeal, Mr. Serrato also argued that the evidence was insufficient to establish his knowledge that methamphetamine involved in the offense was imported. We need not and do not address that argument.

16

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error, and we view the evidence in the light most favorable to the government. *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (quoting *United States v. Worthon*, 520 F.3d 1173, 1178 (10th Cir. 2008)). We review *de novo* the ultimate legal determination of whether a seizure was reasonable under the Fourth Amendment. *Id.*

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry v. Ohio*, the Supreme Court established that a law enforcement officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest." 392 U.S. 1, 22 (1968) (internal quotation marks omitted). Such an investigatory detention "is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *McHugh*, 639 F.3d at 1255.

"Reasonable suspicion requires the officer to act on 'something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Nevertheless, "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause." *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008) (quoting *Sokolow*, 490 U.S. at 7). We look to the totality of circumstances to determine whether reasonable suspicion exists. *McHugh*, 639 F.3d at 1256.

17

The relevant evidence is not disputed. A friend of Mr. Negrete's, Mathew Gerhard, acting as a confidential informant for law enforcement, participated in five controlled buys of methamphetamine from Mr. Negrete between January 20 and February 8, 2011. On one of these occasions, January 24, 2011, Mr. Gerhard went to Mr. Negrete's home to buy methamphetamine and observed that Mr. Serrato was there. Law enforcement, conducting surveillance of the home, saw Mr. Serrato leave the residence in a van with Utah license plates and drive to a nearby motel where he registered with a Utah address.

Skipping ahead, law enforcement learned that a buyer from Iowa was scheduled to purchase methamphetamine from Mr. Negrete on April 6, 2011. Surveillance video showed a van with Iowa plates entering Mr. Negrete's garage on that date. The driver, Terrence Griffin, later testified that he had been told that someone from Salt Lake City was bringing methamphetamine, and that he would have to leave for about an hour when that person arrived. A van with Utah plates did arrive, and Griffin left but saw Mr. Serrato walk into the home. Surveillance showed that the Utah van replaced the Iowa van in the garage and left shortly thereafter. Mr. Griffin returned an hour later, found that Mr. Serrato and his van were gone, but pulled his van into the garage, loaded the methamphetamine and left. Law enforcement stopped the Utah van shortly after it left the Negrete residence, identified the driver as Mr. Serrato, and allowed it to leave. Law

enforcement also stopped the Iowa van, driven by Terrence Griffin, searched it, and found the methamphetamine.[4]

The district court found that law enforcement knew from surveillance that cars, particularly out-of-state cars, would come to Mr. Negrete's house for the purpose of delivering methamphetamine and would park in the garage; and that a delivery of methamphetamine to be later transported to Iowa was scheduled to occur on approximately April 6, 2011. Serrato App. Vol. I at 125. On that date law enforcement observed a Utah vehicle and an Iowa vehicle at Negrete's house. They stopped the vehicle with the Utah plates after it left Mr. Negrete's house to identify the driver whom they suspected of distributing methamphetamine to Mr. Negrete. The stop lasted approximately 10 minutes, and the only information that was obtained was the driver's (Serrato's) identification. *Id.* at 125-56. The district court concluded that "[t]hese facts establish that law enforcement had a reasonable suspicion of Defendant Serrato's involvement with illegal activity when they stopped him on April 6, 2011." *Id.* at 126. The court also found that "the evidence at the hearing established that Mr. Serrato was pulled over after the law enforcement officer observed him going over the speed limit, which is a traffic violation [that] alone is sufficient to justify a traffic stop to obtain Mr. Serrato's name and license number." *Id.*

We conclude, as did the district court, that these facts gave rise to reasonable and

---

[4] Mr. Griffin also described at least three trips with an Iowa source, Master Senthep (also a co-defendant in this case), to Mr. Negrete's house in Casper to obtain methamphetamine.

19

articulable suspicion that Mr. Serrato's vehicle was involved in drug activity and justified a traffic stop. *See United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008).

### E. <u>Sufficiency of Evidence on Firearm Count Against Mr. Negrete</u>.

Mr. Negrete was charged with three firearms-related counts. He was convicted on Count Four which charged that between January 1 and May 13, 2011 he knowingly used and carried a firearm during the commission of a drug trafficking crime (namely, conspiracy to possess with intent to distribute and distribution of methamphetamine as charged in Count One) in violation of 18 U.S.C. § 924 (c)(1). He was acquitted on Count Fifteen which charged that on or about May 13, 2011 he knowingly possessed a firearm in furtherance of a drug trafficking crime (namely, possession with intent to distribute methamphetamine as charged in Count Fourteen). But he was convicted on Count Sixteen which charged that on or about May 13, 2011, having previously been convicted of a crime punishable by imprisonment for more than one year, he knowingly possessed a firearm, namely, a Hi-Point 9mm caliber handgun, which had previously traveled in and affected interstate commerce. Negrete App. Vol. I at 44.

On appeal Mr. Negrete challenges his conviction on Count Four. This count added 60 months consecutively to what otherwise would have been a sentence to imprisonment of 300 months. Mr. Negrete challenges the sufficiency of evidence, arguing that the government did not place a specific firearm into evidence at trial and thus could not prove that the firearm met the statutory definition of a firearm in 18 U.S.C. § 921(a)(3).

20

We review the sufficiency of evidence de novo. *See United States v. Chavis*, 461 F.3d 1201, 1207 (10th Cir. 2006). The question for the court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see also United States v. Nicholson*, 983 F .2d 983, 989 (10th Cir. 1993).

Mr. Negrete was convicted on Count Sixteen (and has not challenged his conviction) of being a felon in possession of a firearm, specifically, a Hi-Point 9 mm handgun. The date charged in Count Sixteen, on or about May 13, 2011, is within the range of dates charged in Count Four. Ms. Cates-Medina, who knew that Mr. Negrete kept a gun in his car and under his pillow when he slept, and who bought ammunition for him for the gun, confirmed that a photograph presented by government counsel (Exhibit 327) depicted Mr. Negrete's gun. Serrato App. Vol. III at 601-06. While executing a search warrant, officers from the Wyoming Division of Criminal Investigation found the gun shown in exhibit 327, loaded and ready to fire, underneath the console in Mr. Negrete's vehicle. Negrete App. Vol. III at 553-57. It was identified as a Hi-Point 9 mm handgun and was test-fired at the Wyoming State Crime Lab to confirm that it was in proper working order. *Id.* at 558, 562. Ammunition was found in Mr. Negrete's office. *Id.* at 555. Furthermore, the parties stipulated that the Hi-Point handgun which is the subject of Count Sixteen is a firearm within the meaning of 18 U.S.C. § 921(a)(3)

21

such that it "is designed to expel a projectile by the action of an explosive and is not an antique firearm." Negrete App. Vol. I at 213

In addition, several other individuals involved in the drug transactions observed Mr. Negrete with a firearm, some even being threatened by him: Jesus Camacho described Mr. Negrete's brandishing a black pistol that he pulled from his waistband, Negrete App. Vol. III at 241-42; Mr. Cervantes saw a pistol in Mr. Negrete's waistband more than once and testified that Mr. Negrete told him the gun was for protection against home invasions by people to whom he was selling drugs, *id.* at 259-60, 388; Mr. Griffin described a black 9 mm pistol that he thought might have been a Glock, adding that Mr. Negrete slammed the pistol on his desk and warned that if Griffin interfered with Mr. Senthep's income, Negrete would hire a junkie to put a "bullet in your head," Serrato App. Vol. III at 378-80; and Mr. Gerhard, who testified that in February or March of 2011 Mr. Negrete withdrew a 9 mm handgun from a drawer in his office and pointed it at him, Negrete App. Vol. III at 234-38.[5]

Viewing this evidence in the light most favorable to the government, we hold that there was substantial evidence of Mr. Negrete's guilt. We do not know why a firearm was not placed in evidence, but that is not the only means of proving the charge. We are not persuaded that the jury's determination should be overturned.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[5] The record does not necessarily confirm that each of these firearm sightings was the same weapon. However, Mr. Negrete has not raised a unanimity argument, and we therefore do not address it.

Appellant's motion for remand is DENIED.