<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STORM MICHAEL BELLAMY,

    Defendant - Appellant.

No. 18-3189

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:17-CR-20020-CM-1)**
_____

Michael L. Belancio of Foland, Wickens, Roper, Hofer & Crawford, P.C., Kansas City, Missouri, for the Defendant – Appellant.

Jared S. Maag, Assistant United States Attorney (Stephen R. McAllister, United States Attorney and Carrie N. Capwell, Assistant United States Attorney, District of Kansas, on the brief), Kansas City, Kansas, for the Plaintiff – Appellee.
_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

    In fall 2016, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began investigating Storm Michael Bellamy, a convicted felon, for suspected methamphetamine distribution. On the morning of October 5, 2016,

Mr. Bellamy's housemate ordered him to vacate the home. Twelve hours later, ATF agents executed a warrant to search the premises. In Mr. Bellamy's former bedroom, they discovered his personal effects, a rifle with a loaded large-capacity magazine attached, and a second large-capacity magazine nearby.

Mr. Bellamy pled guilty to being a felon in possession of a firearm. The district court found that he possessed the rifle and the large-capacity magazines. It applied United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") § 2K2.1(a)(4)(B), which establishes a base offense level of 20 when a convicted felon possesses a semiautomatic firearm with a large-capacity magazine that is either attached or in close proximity to the firearm. U.S.S.G. § 2K2.1(a)(4)(B); *see id.* cmt. n.2. The court sentenced Mr. Bellamy to 40 months in prison.

Mr. Bellamy challenges the procedural reasonableness of his sentence. Because he was ejected from the house, he argues he did not possess the rifle when agents seized it on the evening of October 5. He also claims there was insufficient evidence to show that the rifle he possessed earlier that morning had a large-capacity magazine attached or in close proximity to it. Mr. Bellamy thus argues the district court erred in assigning him a base offense level of 20 under § 2K2.1(a)(4)(B).

The record contains ample support for the district court's finding that Mr. Bellamy possessed the rifle and the large-capacity magazines. Accordingly, the court did not abuse its discretion in sentencing him. Exercising jurisdiction under 28 U.S.C § 1291 and 18 U.S.C. § 3742(a), we affirm.

## I. BACKGROUND

### A. *U.S.S.G. § 2K2.1(a)(4)(B)*

U.S.S.G. § 2K2.1(a) lists base offense levels for offenses involving the unlawful receipt, possession, or transportation of firearms or ammunition. The minimum base offense level for a felon in possession of a firearm is 14. U.S.S.G. § 2K2.1(a)(1)(6). But under § 2K2.1(a)(4)(B), the base offense level is 20 if:

> the (i) offense involved a . . . semiautomatic firearm that is capable of accepting a large capacity magazine; . . . and (ii) defendant . . . was a prohibited person at the time the defendant committed the instant offense . . . .

The commentary to this Guidelines provision specifies that a "'prohibited person' means any person described in 18 U.S.C. § 922(g)," which includes all convicted felons. U.S.S.G. § 2K2.1 cmt. n.3.[1] The commentary also explains:

> [A] "semiautomatic firearm that is capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

*Id.* cmt. n.2.

---

[1] The parties do not dispute Mr. Bellamy's status as a "prohibited person."

## B.  *Factual History*[2]

Mr. Bellamy had been convicted of several felonies before the events leading to this case.  In September 2016, he moved into a home occupied by Robert Spalding, Jr.  Soon after, the ATF began investigating Mr. Bellamy for suspected distribution of methamphetamine.  As part of this investigation, ATF agents searched trash bins at the house and discovered drug paraphernalia, mail with Mr. Bellamy's name on it, and an empty box of Wolf .223 ammunition, which can be used in a 5.56-caliber rifle.[3]

On the morning of October 5, 2016, Mr. Spalding "physically ejected" Mr. Bellamy from the house.[4]  ROA, Vol. 2 at 49-50.  Approximately 12 hours later, ATF

---

[2] The following facts are drawn from Mr. Bellamy's PSR and the transcripts of his sentencing and change of plea hearings.  The parties do not dispute these facts.  *See* Aplt. Br. at 7 (noting that "[t]here is very little factually in dispute in this case" and that "Mr. Bellamy and the Government stipulated the sentencing facts were true without the need to present evidence"); ROA, Vol. 2 at 35 (prosecutor's statement that the Government "pretty much stipulated to most of the facts that . . . [are] contained in the PSR").

[3] This firearm is sometimes described as a 5.56-mm rifle.  Because the record materials refer to the firearms in this case using the caliber designation, we use that terminology also.

[4] The record shows that Mr. Bellamy sold methamphetamine from the house and that Mr. Spalding instructed him to stop.  At sentencing, the Government claimed that "Mr. Spalding was tired of – of Mr. Bellamy living there" and "didn't want him there anymore."  ROA, Vol. 2 at 54.  But beyond this, the record does not explain the reason for the ejection.

agents executed a search warrant at the residence.[5] Mr. Bellamy was not present during the search. When the agents arrived at the house, they discovered Mr. Spalding hiding in the attic. Mr. Spalding informed them he had ejected Mr. Bellamy, who previously occupied two bedrooms on the first floor. He stated Mr. Bellamy had given him a Sig Sauer .380 handgun but had later taken it back. He said Mr. Bellamy used methamphetamine regularly and stored methamphetamine and a rifle in his closet. Mr. Spalding also said Mr. Bellamy had installed a video surveillance system to record video throughout the house.

In Mr. Bellamy's room, the agents found his birth certificate and an unloaded large-capacity magazine, which was stored in a dresser drawer. They also discovered a Delaware Machinery 5.56-caliber rifle in Mr. Bellamy's closet. The rifle had one round of ammunition in the chamber and an additional 19 rounds in an attached large-capacity magazine.

Elsewhere in the house, the agents found plastic baggies, drug paraphernalia, more than 100 rounds of assorted ammunition, the Sig Sauer handgun, and a firearms case. They also recovered a Night Owl DVR surveillance system. Video from this system showed Mr. Bellamy carrying a rifle on September 21, 2016, but did not show whether a high-capacity magazine was attached.[6] The recording also depicted several

---

[5] This timing appears coincidental. The record provides no indication the ATF agents knew Mr. Bellamy had been ejected or planned their search to coincide with his absence.

[6] At the sentencing hearing, the Government conceded that the video was "very grainy" and that "you can't tell if there's a large capacity magazine attached to [the rifle]." ROA, Vol. 2 at 44.

visitors entering and exiting the house between Mr. Bellamy's ejection and the ATF search.  At least one visitor appeared to carry something into the house.

DNA and fingerprint tests performed after the search revealed no evidence linking Mr. Bellamy to the magazines or ammunition.

## C. *Procedural History*

A grand jury charged Mr. Bellamy with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2).

Mr. Bellamy pled guilty to the charge in the indictment without a plea agreement.  At his change of plea hearing, he emphasized that he was "admitting to the conduct in the indictment"—namely, "that he possessed [two] firearms, that they were . . . inter-mingled with his possessions."  But he did not admit to possession of any large-capacity magazines.  ROA, Vol. 2 at 21-22.

After Mr. Bellamy's guilty plea, the United States Probation Office prepared a Presentence Investigation Report ("PSR").  It stated that Mr. Bellamy possessed a semiautomatic firearm capable of accepting a large-capacity magazine because the rifle recovered from Mr. Bellamy's closet had an attached magazine that held more than 15 rounds of ammunition.  The PSR applied U.S.S.G. § 2K2.1(a)(4)(B), which sets a base offense level of 20 when a felon in possession offense involves a large-capacity semiautomatic firearm.  It then subtracted three levels for acceptance of responsibility, leaving Mr. Bellamy's total offense level at 17.  The PSR assigned a

criminal history category of IV and calculated a Guidelines sentence range of 37 to 46 months.[7]

Mr. Bellamy objected to the PSR in a sentencing memorandum, arguing there was insufficient evidence to apply § 2K2.1(a)(4)(B). Although he did "not contest that one of the firearms at issue was loaded with a high capacity magazine at the time of seizure," he claimed the Government had "no evidence that the magazine was attached or in close proximity . . . at the last time that Mr. Bellamy could have possibly had dominion and control over the premises, or the weapon." ROA, Vol. 1 at 24. He also alleged that "at least two people, who had grudges against [him] were . . . in the premises during the twelve hour period . . . before law enforcement conducted the search," and he suggested that these individuals might have "move[d] objects within the demised premises." *Id.* at 27 (footnote omitted). He thus asserted the Government could not show by a preponderance of the evidence that "there were large capacity magazines either loaded into or within close proximity to one of the firearms" when he possessed the rifle. *Id.* at 26.

At sentencing, the district court concluded "it's more likely . . . that this firearm and the magazine were attached at the time that [Mr. Bellamy was at the house], and at the time [he] left, that was the condition of the firearm and the magazine." ROA, Vol. 2 at 61-62. It found the Government had met its burden of

---

[7] If the PSR had not applied § 2K2.1(a)(4)(B), Mr. Bellamy's total offense level would have been 12 (a base offense level of 14 under § 2K2.1(a)(1)(6), less two levels for acceptance of responsibility), and his Guidelines range would have been 21 to 27 months.

showing that Mr. Bellamy had possessed a firearm with a large-capacity magazine attached or in close proximity. The court overruled Mr. Bellamy's objections and found that "the base offense level was accurately calculated in the presentence investigation report." *Id.* at 62. It then adopted the PSR's calculations and sentenced Mr. Bellamy to 40 months in prison followed by two years of supervised release. Mr. Bellamy timely appealed.

## II. DISCUSSION

The record supports the district court's finding that Mr. Bellamy possessed a rifle with a large-capacity magazine attached or in close proximity. The court therefore did not abuse its discretion when it applied U.S.S.G. § 2K2.1(a)(4)(B).

### A. *Standard of Review and Legal Background*

We review criminal sentences for reasonableness, applying an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Bergman*, 599 F.3d 1142, 1150 (10th Cir. 2010). This review "includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence." *United States v. Ortiz-Lazaro*, 884 F.3d 1259, 1261 (10th Cir. 2018) (quotations omitted); *see also United States v. Sanchez-Leon*, 764 F.3d 1248, 1261-62 (10th Cir. 2014).

A challenge to the application of § 2K2.1(a)(4)(B) contests the sentence's procedural reasonableness. *See United States v. Arevalo-Magana*, 686 F. App'x 559,

561-62 (10th Cir. 2017) (unpublished).[8] "We review de novo any legal questions in a district court's application of the Guidelines, and we review any factual findings for clear error." *United States v. Serrato*, 742 F.3d 461, 468 (10th Cir. 2014) (quotations omitted); *see also United States v. Madkins*, 866 F.3d 1136, 1144 (10th Cir. 2017) ("We review challenges to the imposition of guidelines enhancements for clear error as to findings of fact and de novo as to questions of law."). "We defer to the district court's application of the Guidelines to the facts." *United States v. Martinez*, 512 F.3d 1268, 1275 (10th Cir. 2008).

Mr. Bellamy does not challenge the district court's legal interpretation of § 2K2.1(a)(4)(B). Rather, he challenges the court's factual finding that he possessed a firearm with a large-capacity magazine attached or in close proximity to it. Where "the district court's factual finding is itself legally sufficient to support a[n] . . . enhancement . . . , we may reverse only if the finding is itself clearly erroneous." *United States v. Shippley*, 690 F.3d 1192, 1199 (10th Cir. 2012). Accordingly, we review Mr. Bellamy's attack on the district court's factual finding for clear error. *See Arevalo-Magana*, 686 F. App'x at 562-63 (using clear error standard to assess a district court's application of § 2K2.1(a)(4)(b)); *United States v. Gevedon*, 214 F.3d 807, 812 (7th Cir. 2000) (reviewing district court's finding that defendant possessed

---

[8] Although not precedential, we find the reasoning of this unpublished opinion instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

9

high-capacity weapons and qualified as a "prohibited person" under § 2K2.1(a)(4)(B)(i) for clear error).

"A finding is clearly erroneous only if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Shippley*, 690 F.3d at 1199 (brackets and quotations omitted). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

"The facts necessary to calculate the guidelines sentencing range must be proved by a preponderance of the evidence." *United States v. Flonnory*, 630 F.3d 1280, 1285-86 (10th Cir. 2011); U.S.S.G. § 6A1.3, cmt. ("[The] use of a preponderance of the evidence standard is appropriate . . . in resolving disputes regarding application of the guidelines to the facts of a case."). The Government bears this burden. *United States v. Rutter*, 897 F.2d 1558, 1560 (10th Cir. 1990). It must show that "the existence of a fact is more probable than its nonexistence." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993).

10

## B. *Analysis*

The district court's finding that Mr. Bellamy possessed a semiautomatic firearm capable of accepting a large-capacity magazine was not clearly erroneous.

### 1. **Evidence Supports Application of § 2K2.1(a)(4)(B)**

Mr. Bellamy concedes he possessed the rifle on the morning of October 5, 2016. He also concedes that when the weapon was seized 12 hours later, it had a large-capacity magazine attached and another one nearby. Accordingly, the only question is whether it was clearly erroneous for the district court to find by a preponderance of the evidence that a large-capacity magazine was attached or in close proximity to the rifle on the morning of October 5. U.S.S.G. § 2K2.1(a)(4)(B); *see Flonnory*, 630 F.3d at 1285-86. We conclude it was not.

During the search, the ATF agents discovered the rifle and its attached magazine stowed in Mr. Bellamy's closet—a private and concealed part of the bedroom. The rifle's location supports an inference that Mr. Bellamy possessed both the firearm and its attached magazine before Mr. Spalding ordered him to leave the home.

The ATF agents also discovered a second large-capacity magazine stored in Mr. Bellamy's dresser drawer. Elsewhere in the room, they found his belongings, including his birth certificate and credit cards. Storage of the second large-capacity magazine in a discreet location alongside Mr. Bellamy's personal effects further suggests that the large-capacity magazines belonged to him and that he kept them attached or in close proximity to the rifle.

11

In addition, several days before the October 5 search, ATF agents searched the trash outside the house. They discovered paperwork bearing Mr. Bellamy's name. They also found an empty box of Wolf .223 ammunition, which could be used in the large-capacity magazines later found in Mr. Bellamy's bedroom. This evidence corroborates that Mr. Bellamy possessed both the rifle and the large-capacity magazines before the October 5 search.

It was thus "plausible" for the district court to conclude that the Government carried its burden. *Anderson*, 470 U.S. at 574. The court did not clearly err in finding that Mr. Bellamy possessed the rifle with a large-capacity magazine attached or in close proximity, and it therefore did not abuse its discretion in assigning a base offense level of 20 under U.S.S.G. § 2K2.1(a)(4)(B).

### 2. Mr. Bellamy's Alternative Explanations Do Not Establish Clear Error

Mr. Bellamy's alternative explanations for the presence of the large-capacity magazines in his bedroom are unconvincing. He notes that after Mr. Spalding told him to leave the house, other individuals entered and exited the premises and therefore had access to his room. He also claims Mr. Spalding and a woman who entered the house held grudges against him, implying they might have planted the magazines in his room to get him in trouble.[9]

---

[9] According to Mr. Bellamy, this woman "was on the premises for at least 15 minutes looking to retrieve $500 from Mr. Bellamy that she claim[ed] he owed her in relationship to a car deal that had gone awry." ROA, Vol. 1 at 27.

12

These theories are implausible. The possibility that someone attached a magazine to Mr. Bellamy's rifle and placed another magazine in his dresser drawer after he was ejected from the house is far less likely than Mr. Bellamy himself placing the magazines on the rifle and in his drawer. In addition, the record lacks any evidence that Mr. Spalding or any individuals who visited the house had forewarning that the search was going to occur.[10]

As discussed above, a district court's "finding is clearly erroneous only if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Shippley*, 690 at 1199. And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. Here, the evidence supported the Government's position and the court's finding. There is no "definite" or "firm" reason to believe the district court erred. *Shippley*, 690 at 1199.

\*     \*     \*     \*

The Government needed only to prove by a preponderance of the evidence that the large-capacity magazines were attached or in close proximity to the rifle at the time Mr. Bellamy admits he possessed it. And on clear error review, we may not reverse "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 573-74. Here, the facts—a rifle

---

[10] In fact, the ATF agents found Mr. Spalding hiding in his attic, which suggests he was startled by and unprepared for the search.

and an attached large-capacity magazine stowed in the bedroom closet, a second large-capacity magazine cached in the bedroom dresser, and large-capacity ammunition packaging discovered days before the search—support a plausible inference that when Mr. Bellamy possessed the rifle on the morning of October 5, 2016, the large-capacity magazines were attached or in close proximity. The court did not abuse its discretion by assigning Mr. Bellamy a base offense level of 20 under § 2K2.1(a)(4)(B).

## III. CONCLUSION

We affirm the district court's judgment.