**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**April 19, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GALIMA MURRY,

    Defendant - Appellant.

No. 20-1214

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RAJESH RAMCHARAN,

    Defendant - Appellant.

No. 20-1241

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DIANN RAMCHARAN,

    Defendant - Appellant.

No. 20-1243

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.                                                              No. 20-1245

KEN HARVELL,

    Defendant - Appellant.

_____

**Appeals from the United States District Court
for the District of Colorado
(D.C. Nos. 1:19-CR-00154-DME-4; 1:19-CR-00154-DME-1;
1:19-CR-00154-DME-3, & 1:19-CR-00154-DME-5)**

_____

Ryan A. Ray, Norman Wohlgemuth, Tulsa, Oklahoma, for Defendant-Appellant Galima Murry.

Grant R. Smith, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the brief), Denver, Colorado, for Defendant-Appellant Rajesh Ramcharan.

James L. Hankins, Edmond, Oklahoma, for Defendant-Appellant Diann Ramcharan.

Jonathan S. Willett, Boulder, Colorado, for Defendant-Appellant Ken Harvell.

Marissa R. Miller, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **HARTZ**, **KELLY**, and **CARSON**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

    Fundamental to our justice system—and even our democracy—is the jury.

Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 860 (2017).  The jury checks

government power.  It resolves factual disputes.  It determines ultimate questions of

guilt or innocence.  In doing so, "its judgments find acceptance in the community, an

2

acceptance essential to respect for the rule of law." Id. And voir dire—allowing the court to question potential jurors—helps guarantee an impartial jury.

Three out of four defendants here identify as minorities, and two are illegal immigrants. They assert that the district court abused its discretion in failing to ask the potential jurors whether they harbored racist views. One defendant posits that if "America as an institution harbors racial prejudice in the context of immigration law, it stands to reason that some members of that same institution also harbor similar views." But the Supreme Court has long held that no constitutional presumption of juror bias exists for or against members of any particular racial or ethnic groups. Rosales-Lopez v. United States, 451 U.S. 182, 190 (1981) (plurality opinion). And we decline to create such a presumption today. Rather, without any substantial indication that racial or ethnic prejudice likely affected the jurors, we hold that the district court did not abuse its discretion in denying Defendants' requests to directly examine the jurors about the subject.

Defendants also appeal the district court's evidentiary rulings, the jury instructions, and the sufficiency of the evidence. We exercise jurisdiction under 28 U.S.C. § 1291. Finding Defendants' arguments with respect to these issues equally unpersuasive, we affirm.

## I.

Defendants Rajesh and Diann Ramcharan immigrated to the United States from Trinidad and Tobago with their son Raul. After overstaying their temporary-visitor visas, Rajesh and Diann moved to Colorado Springs, Colorado. They

integrated themselves into the community—becoming involved in a local church pastored by Defendant Ken Harvell and starting a landscaping business.

The Ramcharans and Harvells became close—so close that the Ramcharans listed the Harvells as emergency contacts on their children's school forms. Despite marrying in 2001 in Trinidad and Tobago, the Ramcharans remarried in the United States in 2010 with Defendant Harvell officiating. A short two months later, the Ramcharans filed for divorce while Diann was seven-months pregnant with their third child. The government asserts this was the beginning of a paper trail that the Ramcharans and Harvell initiated to obtain green cards for Rajesh, Diann, and Raul. The divorce petition listed Diann's address as the family home. Rajesh listed the Harvells' home as his address. Despite the separate addresses, Rajesh and Diann continued to live in the same home, renewing the lease on their apartment several times, taking out renters' insurance together, and continuing to present themselves as husband and wife to friends and neighbors.

Five days after her divorce became final, Diann married a United States citizen—Defendant Galima Murry. Once again, Defendant Harvell signed the marriage certificate. Despite the marriage, Rajesh and Diann opened a new bank account together the next day. Three weeks following the wedding, Murry, an Army sergeant stationed in Colorado Springs, deployed to Afghanistan. Before deploying, Murry drafted a note, which provided that his new wife, Diann, would receive nothing in the event of his death, serious injury, or divorce. Rather, his assets would pass to his brother. Diann signed the note. Murry's brother remained the beneficiary

4

on his life insurance.  Murry and his brother were not close. Murry's brother was unaware of Diann's existence.

Once married, Murry immediately began collecting an extra $250 per month in Afghanistan for a "family separation allowance."  Upon his return to the United States, Murry obtained additional perks from both the military and the Ramcharans. Murry began claiming Raul, the Racharans' oldest son, as a dependent on his taxes. He received extra money from the Army in the form of a housing allowance because of Diann and Raul, which amounted to over $1,000 per month—a stipend he collected for nearly six years and benefited him around $100,000.  The Ramcharans gave Murry a vehicle bought through their landscaping business.  But as the vehicle-transfer paperwork shows, Murry did not live with Diann.  Rajesh listed his address as the location where Diann lived and listed Murry's address as Murry's separate apartment.  The Ramcharans used Harvell's Social Security number to register the car with the Department of Motor Vehicles and listed Harvell as an "authorized employee" though he never worked for the landscaping business.

After Murry deployed, Diann filed paperwork for a green card—form I-130, Petition for Alien Relative, and form I-485, Application to Register Permanent Residence or Adjust Status. Because of Murry's deployment, Diann attended her interview alone and testified under oath that Rajesh had returned to Trinidad and Tobago.  Diann became a conditional permanent resident, which allowed her to obtain a green card for a two-year period.

The Army transferred Murry to Washington, then Maryland, then Georgia. Murry requested reimbursement for moving expenses from the Army for not only himself, but also Diann and Raul. On the transfer forms, he misspelled Diann's first name on each form and gave four different birth dates for Raul.

Three years after her wedding to Murry, Diann filed form I-751, Petition to Remove Conditions on Residence. On the form, Diann and Murry signed a statement certifying their marriage was "not for the purpose of procuring an immigration benefit." They attached a letter to the petition from Harvell stating that he had married the couple and that they were still together. The government approved the form and Diann became a lawful permanent resident with a green card valid for ten years, which enabled her to obtain a green card for Raul.

Having secured lawful permanent-resident status, Diann began to arrange a marriage for Rajesh. While working at Walmart, Diann became friends with a co-worker, Angelica Guevara. Diann told Guevara that she had married a United States citizen to stay in the United States. Diann referred to Murry as her "green card husband." Diann told Guevara that Murry benefited too from his additional Army benefits. She explained that Rajesh's visa had expired and that he could face deportation. She further explained that Rajesh faced danger in Trinidad and Tobago, that he might be unable to return to the United States if deported, and that her children would lose their father as a result. Diann asked Guevara to marry Rajesh to keep her family together—assuring Guevara that people did not get in trouble for this type of activity. Diann told Guevara that she would walk her through the process.

6

Guevara would just have to take some pictures, sign some papers, and wait two years before she could obtain a divorce. Guevara agreed.

Guevara married Rajesh with Harvell officiating. Harvell explained to Guevara that she was doing God's work. The wedding was small and without fanfare. And in Guevara's words, "it wasn't a real ceremony." After Harvell pronounced them husband and wife, "everybody laughed." No pictures show Guevara and Rajesh kissing on the mouth because she did not want to do so. After the ceremony, Harvell, the Ramcharans, and Guevara had lunch together at Burger King, and Diann told Guevara that the post office would deliver her mail to Harvell's address to make it appear that she lived there with Rajesh. Guevara executed a lease for the Harvell's basement. She never saw the basement and instead moved in with her boyfriend a few months after her marriage.

The government became suspicious during an interview for Raul's green card that Murry did not attend. The interviewer asked Diann about Murry's absence. She replied that he was deployed to Maryland. The interviewer asked whether she moved to Washington with Murry. Diann replied that she had not because her children wanted to be near their father. When the interviewer looked back at Diann's file, he noticed that she had once stated that she lived in Washington with Murry and that Rajesh had returned to Trinidad and Tobago. The interviewer forwarded the file for investigation.

United States Custom and Immigration Services began its investigation and noticed the connection between the Ramcharans, Murry, Guevara, and Harvell.

Immigration agents visited the Ramcharans' house on a weekday morning in Colorado Springs, where they found Rajesh outside scraping ice off his car. Shortly after that visit, Rajesh filed his form I-485, on which he swore that he lived at the Harvells' address and that he had "not withheld any information that would affect the outcome of this application."

Agents next went to the Harvells' residence—the address where Rajesh and Guevara supposedly lived. They arrived at 7:45 a.m., and Harvell answered the door. Neither Rajesh nor Guevara were there. Agents asked Harvell whether Rajesh lived at the residence, and he responded: "He can live here." Agents found Harvell's responses to their remaining questions vague and evasive.

After the Harvell stop, agents arrived at Guevara's boyfriend's residence. Guevara insisted that they speak to her outside—her boyfriend was unaware of Rajesh. Guevara at first tried to stick to the story, but she couldn't keep up with the agent's detailed questions. Guevara, believing she looked guilty, decided to tell the truth. Guevara wrote a statement confessing that her marriage was fake and for immigration purposes only.

Agents then returned to the Ramcharans' home. Diann admitted that Rajesh spent the night sometimes but only to babysit. Diann said Murry was in Maryland, but she did not know which city. After learning about Guevara's confession, she became evasive and ended the interview. A few months later, Diann and Murry divorced.

Agents called Murry on the telephone after the divorce, but he refused to answer several questions. The Army had more success. Murry admitted to the Army investigator that Diann and Raul never lived with him, yet he had claimed the family-moving expenses and housing allowance. Despite this confession, Murry maintained that the marriage with Diann was real. He claimed to have sent her funds while apart, but subpoenas yielded no transfers between the two.

Guevara, cooperating with the government, called Diann from an agent's office. Guevara said that she wanted to confess everything: that the marriage "was not a real marriage" and that she "was just trying to help" the Ramcharans. Diann said she understood but encouraged Guevara to maintain that she married Rajesh but it did not work out. Diann hung up on Guevara.

The government executed a search warrant on Diann's home. Agents found a framed photo of Diann and Rajesh in the front hall captioned, "Bless this house with laughter and love." The bed in the master bedroom looked used on both sides. Above the bed was a sign that read "Always kiss me goodnight." The closet had both men's and women's clothing in it. And Rajesh's cell phone was on the nightstand along with men's deodorant.

A grand jury indicted Diann, Rajesh, Murry, Guevara, and Harvell. Guevara pleaded guilty to one count of conspiracy. Diann, Rajesh, Murry, and Harvell proceeded to trial. Count one charged Rajesh, Diann, and Harvell with entering marriage for the purpose of evading immigration laws in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 2 based on the marriage of Rajesh and Guevara. Count

9

two charged Rajesh, Diann, Harvell, and Murry with making false statements to government officials in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2 based on Diann's form I-751.  Count three charged Rajesh, Diann, and Harvell with making false statements to government officials in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2 based on Rajesh's form I-485.  Count four charged Rajesh, Diann, Harvell, and Murry with conspiracy to commit marriage fraud and making false statements to government officials in violation of 18 U.S.C. § 371 based on their actions from July 2010 to August 2017.

Prior to voir dire, the district court asked prospective jurors to fill out a questionnaire, which asked these three questions:

> 22.  Have you or has anyone in your immediate family had any experience with U.S. Immigration Authorities?

> 23.  To your knowledge, have you, or has anyone in your immediate family or anyone with whom you have a close personal relationship ever sought to obtain a right to reside in the United States as a result of a marriage to a United States citizen?

> 24.  Do you believe there is any reason why you cannot be a fair and impartial juror in a criminal case regarding immigration and residency issues?  If yes, please give your reason(s).

Also before trial, Rajesh submitted a list of proposed voir dire questions.  Two questions explored whether a potential jury member held prejudicial views about race.  Rajesh requested that the district court ask the following:

> Does the race, ethnicity, or religion of the immigrant affect your thoughts on whether that person should be welcome in the United States?

> You may have heard that President Trump made the following statement: "why are we having all these people from shit hole countries come here?"

10

in reference to countries such as El Salvador, Haiti, and African nations. What do you think about that statement?

The district court asked neither question on the first day of voir dire but did begin by summarizing the charges, emphasizing that the case involved immigration. The district court asked the potential jurors twice if anything immigration-related would prevent them from being fair and impartial. One potential juror responded affirmatively, and the district court dismissed that juror for cause. The district court also asked many jurors individually about immigration. The district court excused five potential jurors for cause based on their views on immigration.

Rajesh objected to the voir dire proceedings and moved the district court to directly address the issue of racial and ethnic prejudice. Arguing to the court, Rajesh's attorney posited: "I think that that is important for the Court to examine with the jurors how they feel about defendants who don't look like them and whether or not they have any implicit or explicit bias." Diann joined in the motion, her attorney stating, "If I had an opportunity to ask the jury, I would say, 'We are living in a country right now where the President has indicated there are certain shithole countries.'" The government noted its problem with a question about race. It argued that no one would introduce any evidence that race, ethnicity, or religion played a role in what occurred. And any question about a "shit hole country" would inject something into the case that was missing. Rajesh's attorney countered that the evidence was present in the courtroom by the very color of Defendants' skin and that to say "we don't see color" was offensive.

The district court sided with the government.  In its oral ruling, the district court told the parties that it had covered this subject.  The district judge stated that this voir dire was one of the most extensive he had ever participated in as a lawyer or a judge, noting that he had never granted as many for-cause challenges.  The district court said that asking potential jurors if they are biased or prejudiced is not the best way to detect bias and prejudice.

The trial lasted nine days.  The government presented almost twenty witnesses and introduced over 100 exhibits.  The government presented documentary evidence consisting of the leases, insurance policies, and bank statements.  The Ramcharans' neighbors and friends testified about the Ramcharans' shared home, joint parties, and representation of marital status.  Another friend testified that Diann told her about having a green-card husband.  Guevara also testified.  She described how Diann persuaded her to join the conspiracy, how Harvell married her to Rajesh, and how she confessed.  The jury heard the recorded call between Guevara and Diann.

At trial, the Ramcharans contended that their marriages to Guevara and Murry were real even if unconventional.  They argued that their lives remained intertwined after their divorce because of their children and their business.  Murry also contended at trial that his marriage to Diann was real and that their relationship fell apart following his deployment.  Harvell maintained that he was not involved in the alleged conspiracy and did not know what the others were doing.  He asserted that the Ramcharans exploited his kindness.

The jury convicted Rajesh, Diann, and Murry on all counts against them. The jury convicted Harvell on counts three and four but acquitted him on counts one and two. Rajesh, Diann, Murry, and Harvell appealed.

## II.

Rajesh, Diann, and Murry first argue that the district court erred by declining to ask the jury pool about racial bias. Second, Diann and Harvell appeal the district court's refusal to exclude testimony that Harvell "had done this before." Third, Diann challenges a jury instruction that stated, "a person intends the natural and probable consequences of acts knowingly done or omitted." Fourth, Harvell argues that the district court wrongfully declined a proposed instruction on the First Amendment. Fifth, Harvell argues that the district court erred by excluding evidence about his mental state and religious beliefs. Sixth, Murry appeals the district court's decision not to take judicial notice of the fact that "Recruiter" is a "Military Occupational Specialty," or "MOS." Seventh, Murry argues that the jury lacked sufficient evidence to support his conviction on counts two and four. Eighth, and finally, Harvell contends that the jury lacked sufficient evidence to support his conviction on counts three and four. Addressing each issue in turn, we affirm.

## A.

Defendants Rajesh, Diann, and Murry first contend that the district court abused its discretion when conducting voir dire. The district court has discretion

13

over the scope of voir dire at trial. United States v. Espinosa, 771 F.2d 1382, 1405 (10th Cir. 1985) (citations omitted). And we will not disturb that discretion absent a clear showing that the district court abused it. Id. (citations omitted).

The Supreme Court has long recognized that voir dire plays a critical function in assuring a defendant that the court will honor his Sixth Amendment right to an impartial jury. Rosales-Lopez, 451 U.S. at 188. But the Court has also acknowledged that the adequacy of voir dire is not easily subject to appellate review. Id. The trial judge must determine impartiality and credibility by relying on his own evaluations of demeanor evidence and responses to questions. Id. (citation omitted). We cannot "easily second-guess the conclusions of the decision-maker who heard and observed the witnesses." Id.

Despite the ample discretion a district court has in empaneling a jury, the Constitution may require questioning prospective jurors about racial or ethnic bias. Id. at 189. But to be sure, no constitutional presumption of juror bias exists for or against members of any particular racial or ethnic group. Id. at 190. "Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." Id. If not, "the Constitution leaves it to the trial court, and the judicial system within which that court operates, to determine the need for such questions." Id. The Supreme Court recognized that mandating trial courts to engage in such an inquiry in every case would create the impression that

14

justice turns on one's skin color or the accident of birth.  Id.  (citation omitted).  But courts must balance the risk of that impression with the defendant's perception that the jury has undiscovered racial or ethnic biases.  Id. at 191.

The Supreme Court determined that the best practice would allow the defendant to decide whether he would prefer to inquire into racial or ethnic prejudice.  Id.  Failure to honor the defendant's request, however, is reversible error only when the case's circumstances show a reasonable probability that racial or ethnic prejudice might have influenced the jury.  Id.  Ultimately, outside the violent-crime context, "the decision as to whether the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury remains primarily with the trial court, subject to case-by-case review by the appellate courts."  Id. at 192.

Before turning to the merits, we address the government's preservation argument.  The government asserts that we should review the Ramcharans' claims for plain error.  Although Rajesh and Diann objected below, the government believes that they rely on a legal rule they never presented to the district court.  And the government argues that because Murry did not join Rajesh's objection, we cannot address the merits of his claim.[1]

---

[1] The government correctly notes that the Supreme Court has held that a defendant cannot complain the district court failed to question the venire on racial prejudice without having specifically requested such an inquiry.  Turner v. Murray, 476 U.S. 28, 37 (1986).  Murry still contends that Rajesh and Diann's objection was enough to preserve the claim for him.  When evidentiary issues are concerned, we have not yet taken a position on vicarious objections.  United States v. Irving, 665 F.3d 1184, 1207 (10th Cir. 2011) (citing United States v. Ray, 370 F.3d 1039, 1043 n.3 (10th Cir. 2004)).  And we need not do so today.  Even assuming Rajesh's

15

Preserving an issue in the district court is simple.  A party need "only to alert the court to the issue and seek a ruling."  United States v. Ansberry, 976 F.3d 1108, 1124 (10th Cir. 2020) (quoting Harris v. Sharp, 941 F.3d 962, 979 (10th Cir. 2019)).  Federal Rule of Criminal Procedure 51(b) tells parties how to preserve claims of error: "by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection."  Puckett v. United States, 556 U.S. 129, 135 (2009) (quoting Fed. R. Crim. P. 51(b)).  Rajesh requested the district court ask two questions intended to reveal racial or ethnic prejudice.  After the district court failed to ask those questions, Rajesh objected and renewed his request for one of the questions—in his attorney's words—to expose possible juror biases and provide reasonable assurance that the court would discover prejudice if present.  The district court again denied the request.

Despite Rajesh and Diann objecting to the lack of an explicit question to expose racial bias in the potential jury pool, the government faults them for failing to cite to the district court the Rosales-Lopez standard that underpins their appellate briefing.  That standard obligates a district court to ask the potential jury members about racial bias when external circumstances suggest a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence.

---

objection preserved the issue for Murry, Murry's claim still fails given our holding on the issue as to Rajesh and Diann.

In support, the government cites United States v. Bacon, 950 F.3d 1286, 1292 (10th Cir. 2020).  Bacon recites our oft-cited proposition that we decline to allow parties to assert for the first time on appeal legal theories not raised before the district court, "even when they fall under the same general rubric as an argument presented to the district court."  950 F.3d at 1292 (quoting United States v. A.B., 529 F.3d 1275, 1279 n.4 (10th Cir. 2008)) (citing United States v. Buonocore, 416 F.3d 1124, 1128 (10th Cir. 2005); United States v. Anderson, 374 F.3d 955, 958 (10th Cir. 2004)).  In Bacon, the defendant objected to the district court's decision to keep his plea supplement under seal, asserting that a sealed plea supplement in his court records would endanger him.  950 F.3d at 1292.  On appeal, Bacon argued that the district court erred in overruling his objection because the court did not consider the presumptive common-law right of access to judicial records or conduct the balancing test flowing from that presumption.  Id.  We held that because Bacon did not invoke the common-law right of public access in the district court, he forfeited that argument.  Id.

Although Rajesh and Diann did not mention Rosales-Lopez by name to the district court, they asked the district court to probe whether a potential juror's racial or ethnic prejudice would influence the jury's evaluation of the evidence.  Rajesh's attorney argued to the district court:

> this is important information that we need to know about the jurors, the beliefs that they hold as it pertains to the law that they're going to have to apply.  The real issue is—and I know Your Honor has told them, if I give you the law, will you follow it?  If they don't know what the law is, they don't know if they can follow it.  If they don't know what the law is, they

17

can't be able to know whether they have some explicit or implicit bias that would make it impossible for them to follow the law.

. . .

[M]y client is black—he's actually Indian, really; he comes across as a black man living in America. I mean, I think most people would see him that way. And with regard to Mr. Murry, he's also a black man living in America. Ms. Ramcharan is of darker color. I mean, they're all minorities. And I'm just saying that so that the record can reflect their skin color on the record. I think that that is important for the Court to examine with the jurors how they feel about defendants who don't look like them and whether or not they have any implicit or explicit bias.

We know from studies [that have] been done that people do have implicit biases that they may not even know about. So when they're filling out a questionnaire, they may not say, oh, I'm a racist—like one of the potential jurors did say on the questionnaire—but if you start probing a little bit and talking about these issues with potential jurors, they do realize that they have these issues. They want to be fair and impartial, but they need to work through some of these issues in their brains before they realize that maybe they can't be fair and impartial on this particular jury.

. . .

The race and ethnicity of our clients is evidence in this case. There will be in-court identifications of them. And they are all sitting here, their color is evident, and the jury is going to be able to see that. The countries that they come from, their countries of origin, we're all going to hear about that. The fact that Mr. Murry was adopted from an African country, the fact that Mr. and Mrs. Ramcharan are from Trinidad and Tobago in the Caribbean, that is all evidence in this case. It's not injecting it, it's here, and you have to deal with it. And to say simply that, oh, we don't see color, it's just—I mean, it's offensive.

Unlike the defendant in Bacon, Defendants here do not rely on a new legal theory.

Rajesh may not have mentioned Rosales-Lopez by name, but he asked for a jury

instruction on racial bias and objected when the district court refused to provide one

because a jury member could have an explicit or implicit bias that would influence

the jury's evaluation of the evidence.  Thus, we review Rajesh and Diann's claim of error for an abuse of discretion rather than for plain error.

Diann argues that the district court violated her Sixth Amendment rights by failing to ask the jury pool about racial bias.  We disagree.  The district court did not commit reversible error in voir dire.  The Constitution requires a trial judge to grant the request for racial-bias questions only if "racial issues [are] inextricably bound up with the conduct of the trial."  Rosales-Lopez, 451 U.S. at 189 (quotation omitted).  Here, no "special circumstances" of constitutional dimension were present.  The case did not involve a violent criminal act with a victim of a different racial or ethnic group.  Indeed, the government accused Defendants of a victimless crime.  Diann argues race was "inextricably bound up with the conduct of this trial," and there existed "substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors" because "this case involved four defendants of color, from three different cultural backgrounds, each charged with illegal interracial marriage that was for the purposes of curing illegal immigration."  But the illegality of the marriages had nothing to do with the race of Defendants, nor were the marriages illegal in themselves.  Defendants committed crimes by marrying to evade immigration laws, making false statements to government officials, and conspiring to commit marriage fraud.  That immigration sometimes implicates race or ethnicity does not make all immigration cases inextricably bound up with race.  See id. at 192 (finding "no 'special circumstances' of constitutional dimension" when the case involved a

Mexican petitioner who was tried before a jury for his participation in helping three

Mexican immigrants illegally enter the country).  This case is no exception.

Rajesh and Diann's case therefore falls within that category requiring the trial

court to "determine if the external circumstances of the case indicate a reasonable

possibility that racial or ethnic prejudice will influence the jury's evaluation of the

evidence."  We hold that Defendants have not shown that reasonable possibility.

Whether a case presents a reasonable possibility that racial or ethnic prejudice might

have influenced the jury is a case-by-case determination.  Rosales-Lopez involved

immigration—the petitioner was a Mexican who helped three Mexican immigrants

illegally enter the country.  Id. at 184.  The petitioner challenged the trial judge's

refusal to question the jurors about possible racial or ethnic bias.  Id. at 187.   The

Supreme Court held that the trial judge did not abuse his discretion because no

reasonable possibility existed that racial or ethnic prejudice would affect the jury.  Id.

at 194.  Diann and Rajesh's arguments, barring their "interracial marriage" argument,

are nearly identical to those in Rosales-Lopez.[2]  As in Rosales-Lopez, the district

court reasonably determined that a juror's prejudice toward aliens might affect his or

her ability to serve impartially.  The trial judge thus questioned the prospective jurors

about their attitudes toward aliens.  And as in Rosales-Lopez, "[t]here can be no

---

[2] Indeed, the facts of Rosales-Lopez are close to the facts in this case—
prosecution of a member of a minority group for violating immigration laws.
Although Rosales-Lopez is a plurality opinion, the concurrence disagreed with the
plurality opinion only insofar as the plurality opinion might require voir dire more
than the two concurring justices would.

doubt that the jurors would have understood a question about aliens to at least include [non-white] aliens." Id. at 193. Here, the district court excused multiple potential jurors for cause based on their responses to this question. Removing those potential jurors eliminated any reasonable possibility that the jury would be influenced by an undisclosed racial prejudice toward immigrants with darker skin. See id. The Supreme Court has stated also that asking potential jurors generally whether any grounds exist that would make them unable to sit fairly and impartially—as the trial judge did here—coupled with the question about bias towards aliens, leaves "little reason to believe that a juror who did not answer this general question would have answered affirmatively a question directed narrowly at racial prejudice." Id. at 193 n.8.

Under these circumstances, no reasonable possibility that racial or ethnic prejudice would affect the jury existed. Thus, the district court did not abuse its discretion in denying Defendants' request.

B.

Diann and Harvell appeal the district court's evidentiary ruling allowing testimony that Harvell "had done this before." At trial, the government asked Guevara to describe how Diann persuaded her to marry Rajesh. The government followed that question by asking if anyone besides the Ramcharans was involved. Guevara named Harvell, stating that "[h]e was the person who conducted the fake ceremony." The government then asked, "Before the fake ceremony, did Mrs. Ramcharan say anything about Pastor Harvell?" Guevara replied, "Just that he was

somebody who had done this before, and he was also someone that could help them through the process." Harvell and Diann objected on Rule 404(b) and Rule 403 grounds. The district court overruled the objection, ruling that the statement was intrinsic to the case and that the government offered the statement for its effect on the listener. The district court said that the statement on its face was not Rule 404(b) testimony because Harvell had once performed a wedding for Diann. The court then gave a limiting instruction to the jury. The district court instructed the jury that it should consider the statement only as evidence of Guevara's frame of mind and should not receive the statement as evidence of anything that Harvell did or did not do.

We review a district court's decision to admit evidence for abuse of discretion. United States v. Merritt, 961 F.3d 1105, 1111 (10th Cir. 2020) (citing United States v. Tan, 254 F.3d 1204, 1207 (10th Cir. 2001)). Thus, we do not disturb a district court's decision to admit evidence unless we have a "definite and firm conviction" that the district court "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quoting United States v. Leonard, 439 F.3d 648, 650 (10th Cir. 2006)).

Under Rule 404(b), a district court may not admit evidence of other crimes, wrongs, or acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But this rule "only applies to evidence of acts extrinsic to the charged crime." Irving, 665 F.3d at 1212 (quoting United States v. Pace, 981 F.2d 1123, 1135 (10th Cir.

22

1992), abrogated on other grounds as recognized in United States v. Bell, 154 F.3d 1205, 1209–10 (10th Cir. 1998)) (citing United States v. O'Brien, 131 F.3d 1428, 1432 (10th Cir. 1997)).  Indeed, Rule 404(b) is not applicable if the contested evidence is intrinsic to the charged crime.  Id.  (citing O'Brien, 131 F.3d at 1432).

"Other act" evidence is intrinsic "when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged."  Id. (citing United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993)).  Intrinsic evidence is "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury."  Id. (quoting United States v. Parker, 553 F.3d 1309, 1314 (10th Cir. 2009)).  On the other hand, extrinsic evidence "is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense."  Id. (citation omitted).  Thus, "evidence essential to the context of the crime is intrinsic and does not fall under the other crimes limitation of Rule 404(b)."  Id. (quotation omitted).

Here, the district court interpreted Guevara's statement as explaining that Harvell had married Diann and Murry—a fact central to the government's case in Counts two and four.  Because Harvell married Diann and Murry, Guevara's testimony is germane background information directly connected to the factual circumstances of the alleged conspiracy.  Thus, her statement relates directly to the factual circumstances of the crime and is intrinsic to the crime at issue.  Rule 404(b) is inapplicable.

This conclusion does not end our inquiry.  Rule 403 still may exclude the evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."  Fed. R. Evid. 403.  Harvell and Diann both assert that the risk of prejudice substantially outweighed the probative value of the statement.  Diann argues that the government should have used less prejudicial language indicating only that Harvell had performed a marriage in the past for Diann and Murry, not a statement that could imply that Harvell had done it for others aside from the parties here.

Our cases favor admission of relevant evidence not otherwise prohibited.  Irving, 665 F.3d at 1213 (citing United States v. Rodriguez, 192 F.3d 946, 949 (10th Cir. 1999)).  Thus, exclusion under Rule 403 is "an extraordinary remedy [that] should be used sparingly."  Id.  (quoting Rodriguez, 192 F.3d at 949).

Unfair prejudice in the context of Rule 403 "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Tan, 254 F.3d at 1211 (quoting Fed. R. Evid. 403 advisory committee's note).  Even if evidence makes a conviction more likely because it adversely affects the jury's attitude toward the defendant separate from its judgment as to his guilt of the crime charged, the risk of prejudice must *substantially* outweigh the probative value of the evidence for a court to exclude it.  Id. at 1211–12 (quoting Rodriguez, 192 F.3d at 951) (citing Fed. R. Evid. 403).

The district court did not abuse its discretion in determining that Guevara's testimony would not unfairly prejudice Defendants.  Indeed, the district court "has

24

broad discretion to determine whether prejudice inherent in otherwise relevant evidence outweighs its probative value." Irving, 665 F.3d at 1214 (quoting United States v. Johnson, 42 F.3d 1312, 1315 (10th Cir. 1994)).  In weighing the probative value of evidence against unfair prejudice, district courts "must 'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'"  Merritt, 961 F.3d at 1115 (quoting United States v. Henthorn, 864 F.3d 1241, 1256 (10th Cir. 2017)).  The district court appropriately weighed the risk of prejudice against the probative value and admitted the testimony.  Giving the evidence its maximum probative force and minimum prejudicial value, the district court did not abuse its discretion in admitting the statement.

The district court also offered a limiting instruction directing the jury to limit its consideration of Diann's statement to its effect on Guevara's decision to go forward in the fraud.  The court also instructed the jury not to consider the statement as evidence of whether Harvell had done anything in the past.  Harvell contends that offering a statement for its "effect on the listener" rather than the truth of the matter asserted is a "novel hearsay theory."  Not so.  We have long held that a statement offered to establish its effect on the listener is not hearsay.  United States v. Smalls, 605 F.3d 765, 785 n.18 (10th Cir. 2010) (citing Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993)).  Thus, the district court did not err in admitting Guevara's testimony.

C.

Third, Diann challenges Jury Instruction No. 21.  That instruction provided:

25

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind.  In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made, or acts done, by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during the trial.

No matter what you infer, you must remember that the burden is always on the government to prove each element of each charged crime beyond a reasonable doubt, including, for each charged crime, the required mental state of the defendant.

We review a district court's decision to give a particular jury instruction for abuse of discretion.  United States v. John, 849 F.3d 912, 918 (10th Cir. 2017) (citing United States v. Williamson, 746 F.3d 987, 990 (10th Cir. 2014)).  To assess whether the district court properly exercised its discretion, "we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case."  Id. (quoting United States v. Faust, 795 F.3d 1243, 1251 (10th Cir. 2015)).  Generally, an instruction on how to assess evidence lies particularly within trial-court discretion because it guides the jurors' common sense in the case's context rather than informing them of the governing law.  Id.

Diann argues that this jury instruction lowered the government's burden of proof or shifted the burden of proof to her.  Although we have expressed discomfort with this instruction for decades, we have repeatedly held that we will not reverse a

conviction because of its use so long as the district court made clear to the jury, through the jury instructions as a whole, that the burden is on the government to prove the requisite mental state beyond a reasonable doubt. Id. at 920 (citing United States v. Heath, 580 F.2d 1011, 1025 (10th Cir. 1978); United States v. Woodring, 464 F.2d 1248, 1251 (10th Cir. 1972)). And the district court did that here. Thus, we conclude the district court did not abuse its discretion in giving Instruction No. 21 to the jury.

D.

Before trial, Harvell proposed a jury instruction that cited the First Amendment and the Religious Freedom Restoration Act ("RFRA"). That proposed instruction stated:

> The First Amendment of the United States Constitution creates an individual right to the free and unobstructed practice of religion. The government may not abridge that right. Therefore, if you find that the government has not disproven beyond a reasonable doubt that the Defendant was practicing religion when the claims of illegal activity in this case occurred, then you must find him not guilty.

The district court rejected the jury instruction because it misstated the law. Harvell argues the district court wrongfully rejected it because the jury should have been permitted to determine whether his sincerely held religious beliefs were genuine and whether the marriage-fraud-conspiracy charge impermissibly burdened his free-exercise rights. We review the district court's rejection of a requested instruction for an abuse of discretion. United States v. Harris, 695 F.3d 1125, 1136 (10th Cir. 2012)

(citing United States v. Turner, 553 F.3d 1337, 1347 (10th Cir. 2009)).  We do not require a district court to give another instruction "if it would simply give the jury a clearer understanding of the issues."  United States v. Williamson, 746 F.3d 987, 990 (10th Cir. 2014) (quoting United States v. Bowling, 619 F.3d 1175, 1184 (10th Cir. 2010)).  And unsurprisingly, we allow a district court to reject an instruction that misstates the law.  Id. (citing United States v. Pinson, 542 F.3d 822, 831 (10th Cir. 2008)).

The government first contends that Harvell either waived or forfeited this argument.  But we need not address the waiver or forfeiture here.  See United States v. Jarvis, 499 F.3d 1196, 1201 (10th Cir. 2007) (holding that forfeiture is not jurisdictional and whether to address the argument is subject to our discretion).  Rather, we turn to the merits and hold that the district court did not abuse its discretion in declining to give a RFRA-defense instruction.  Harvell did not satisfy his burden to prove entitlement to that defense.  "To make out a prima facie RFRA defense, a criminal defendant must show by a preponderance of the evidence that government action (1) substantially burdens (2) a religious belief, not merely a philosophy or way of life, (3) that the defendant sincerely holds." United States v. Quaintance, 608 F.3d 717, 719 (10th Cir. 2010) (citing United States v. Meyers, 95 F.3d 1475, 1482 (10th Cir. 1996)).  A statute substantially burdens a religious belief only if it "prevents the [person] from participating in an activity motivated by a sincerely held religious belief.  Yellowbear v. Lampert, 741 F.3d 48, 55 (10th Cir. 2014) (citing Abdulhaseeb v. Calbone, 600 F.3d 1301, 1315 (10th Cir. 2010); Lyng v.

28

Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988); Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 716–18 (1981)).  Harvell argues that his duty to conduct marriages is a sincerely held religious belief.  That may be so.  But 8 U.S.C. § 1325(c) and 18 U.S.C. § 1001(a) do not criminalize conducting marriages— without more.  Harvell does not argue that his faith requires pastors to use marriage to evade immigration laws or to marry anyone who asks even if the pastor knows the purpose is to evade immigration laws.  So he cannot show those generally applicable statutes substantially burden his religious belief.  Thus, the district court did not abuse its discretion in failing to give the jury an instruction on a RFRA defense.

E.

Fifth, Harvell argues that the district court wrongfully excluded evidence about his mental state and religious beliefs.  Harvell wanted his brother to testify about his deteriorating mental state brought on by Huntington's disease, his "good and religious character"—evidenced by convictions about church doctrine and authenticity—and how "these character traits led him to be overly trustful and victimized by others."  He also wanted to present lay testimony about his mental condition.  The government objected—first because evidence about a medical condition requires expert testimony.  And second because Harvell did not provide required notice under Federal Rule of Criminal Procedure 12.2(b).  As for evidence of Harvell's religious activities, the government objected based on relevance.

The district court held that Harvell could not introduce lay-witness testimony about Huntington's disease.  But the district court allowed Harvell to present

29

evidence about his "functioning at the relevant time of these two weddings." It noted, however, that it would not allow "testimony that is not related specifically to the time period of these weddings." The district court clarified it would allow "people testifying about his functionability and functioning within a proximate period of the wedding" but would not set "an arbitrary time frame." We review a district court's determination of the admissibility of evidence for abuse of discretion. James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207, 1212 (10th Cir. 2011) (quoting United States v. Contreras, 536 F.3d 1167, 1170 (10th Cir. 2008)).

The district court did not err in excluding lay-witness testimony about Huntington's disease. Rule 701 permits lay witnesses—not testifying as experts—to give opinion testimony if it is based on the witness's perception, helpful to understanding the witness's testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of 702. Fed. R. Evid. 701. "Rule 701 'does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness.'" James River Ins. Co., 658 F.3d at 1214 (quoting Randolph v. Collectramatic, Inc., 590 F.2d 844, 846 (10th Cir. 1979)). Rule 701 allows lay witnesses to offer "observations [that] are common enough and require . . . a limited amount of expertise, if any." Id. (quoting United States v. VonWillie, 59 F.3d 922, 929 (9th Cir. 1995)).

Even so, Harvell argues the district court abused its discretion by prohibiting his brother, who is not a doctor, from testifying about Harvell's "deteriorating mental

30

state." He contends this ruling contradicts United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011) (citations omitted), which states, "[s]ince neither Rule 701 nor Rule 704(a) limits the subject matter of lay opinion testimony, there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others." But Goodman continued: "the district court still has the discretion to exclude lay witness testimony for other reasons contemplated by the Federal Rules of Evidence." Id. at 969 (citing United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992); United States v. Hauert, 40 F.3d 197, 202 (7th Cir. 1994)).

Harvell's brother is not a doctor and thus could not opine on Harvell's medical diagnosis. That requires "specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). But the district court still allowed Harvell's brother to testify about Harvell's mental state at the time of the weddings—complying with Goodman and Rule 701(c).

Federal Rule of Criminal Procedure 12.2(b) requires a defendant intending to introduce expert evidence related to a mental condition to notify the government before trial. Harvell did not. And he could not skirt 702's requirements by presenting it as lay testimony under 701. See James River Ins. Co., 658 F.3d at 1216. Indeed, "Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Id. (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment). A district court therefore must scrutinize a witness's testimony "under the rules regulating expert opinion to the extent that the

31

witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Id. (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment). Thus, the district court did not abuse its discretion in limiting the testimony about Harvell's mental condition.

Regarding the evidence about Harvell's "good and religious character," the district court ruled it irrelevant. The district court reasoned that Harvell "could be the most saintly man alive; but if he intended to perform this particular wedding—or these two particular weddings—with the intent of evading Immigration laws, he would be guilty." The district court concluded "that all evidence about the church, social good, and the validity of the church are simply not relevant."

On appeal, Harvell argues the district court wrongfully prohibited this evidence because, in a criminal case, Rule 404(a)(1) permits a defendant to introduce evidence of a pertinent character trait and Rule 405(a) provides that "[w]hen evidence of a person's character . . . is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). We disagree.

The district court did not abuse its discretion in concluding the evidence was irrelevant. Harvell has not shown how his "religious character" is relevant to the charges against him. As the district court observed, if Harvell intended to perform the wedding with the intent to evade immigration laws, the law would adjudge him guilty. His "religious character" is thus not a pertinent character trait. Moreover Rule 405(a)'s allowance for character evidence by reputation or opinion depends on

32

its admissibility.  Rule 405(b) permits a party to introduce relevant, specific instances of the person's conduct when "a person's character or character trait is an essential element of a charge, claim, or defense."  Fed. R. Evid. 405(b).  Harvell's character was not an essential element of a charge, claim, or defense.  Thus, the district court did not abuse its discretion in finding the evidence irrelevant.

F.

Sixth, Murry appeals the district court's decision to not take judicial notice that "Recruiter" is a "Military Occupational Specialty," or "MOS."  An MOS identifies a military member's primary job.  When Murry was married to Diann, his MOS was "19K," which meant that he was a "tanker"—or a crew member on a military tank.

At trial, a United States Citizenship and Immigration Services agent testified about Murry's MOS.  He testified that when he spoke to Diann during his investigation, he asked her what Murry's MOS was.  The agent testified that she said "recruiter," which he found suspicious because "recruiter" is not an MOS.  On cross-examination, Murry's counsel asked the agent if he knew that the Army made "recruiter" an MOS in 2018 and that its code was "79R."

Murry requested the district court take judicial notice that "recruiter" is an MOS.  Murry cited a training manual from the Army's website.  The government objected, claiming that the document was improper impeachment and that the district court should exclude it under Rule 403.

The district court determined the information was relevant, but "not so central that . . . [it] is likely to have a material effect on the outcome of the jury."  It said that taking judicial notice of the fact would "elevate[] that issue above others."   So it denied Murry's motion.  We review a district court's decision to take judicial notice of facts for abuse of discretion.  United States v. Williams, 442 F.3d 1259, 1261 (10th Cir. 2006) (citing Lozano v. Ashcroft, 258 F.3d 1160, 1164 (10th Cir. 2001)).

The district court did not abuse its discretion in declining to take judicial notice that "recruiter" is an MOS.  Federal Rule of Evidence 201 allows a district court to take judicial notice of an "adjudicative" fact, not subject to reasonable dispute, that is "generally known within the trial court's territorial jurisdiction" or that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Rule 201 further requires the court to take judicial notice when a party requests it and supplies the court with the necessary information.  Fed. R. Evid. 201(c)(2).

But the district court has no obligation to allow presentation to the jury of a judicially noticed fact that does not satisfy the usual relevance requirements. Whether a recruiter is an MOS had no bearing on the case.  After all, Murry was a tanker, not a recruiter.  Indeed, Murry could not have introduced evidence that a "recruiter" is an MOS for any purpose other than impeaching the United States Citizenship and Immigration Services agent.  United States v. Walker, 930 F.2d 789, 791 (10th Cir. 1991) (citing State v. Oswalt, 381 P.2d 617, 619 (Wash. 1963)) (explaining such evidence is collateral); see also Fryar v. Curtis, 485 F.3d 179, 184

34

(1st Cir. 2007) (quoting <u>United States v. Beauchamp</u>, 986 F.2d 1, 4 (1st Cir. 1993)) ("A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness."). And when the "extrinsic evidence is only relevant to show that the witness made a specific error of fact, then it is not admissible." Roger Park & Tom Lininger, The New Wigmore, A Treatise on Evidence: Impeachment and Rehabilitation § 4.2 (1st ed., 2022 Cumulative Supplement). Thus, the district court did not abuse its discretion in declining to take judicial notice of the fact that "recruiter" is an MOS.

G.

Seventh, Murry argues the jury lacked sufficient evidence to support his conviction on counts two and four. Count two charged Murry with making false statements to government officials in violation of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2 about Diann's Form I-751 submitted May 2014. Count four charged Murry with conspiracy to commit marriage fraud and make false statements to government officials in violation of 18 U.S.C. § 371. We review de novo the sufficiency of evidence. <u>United States v. Sharp</u>, 749 F.3d 1267, 1275 (10th Cir. 2014) (quoting <u>United States v. Serrato</u>, 742 F.3d 461, 472 (10th Cir. 2014)). We ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> (quoting <u>Serrato</u>, 742 F.3d at 472).

To support a conviction under 18 U.S.C. § 1001(a)(3), the government must show: (1) a defendant made a statement; (2) he knew the statement was false, fictitious, or fraudulent; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material. United States v. Camick, 796 F.3d 1206, 1217 (10th Cir. 2015) (quoting United States v. Harrod, 981 F.2d 1171, 1175 (10th Cir. 1992)). Murry claims that the government presented insufficient evidence to prove the falsity, materiality, and intent elements. He posits that he did not share Diann's intent to marry for an immigration benefit.

The government presented evidence that Murry signed his name on Diann's Form I-751, certifying that "the marriage . . . was not for the purpose of procuring an immigration benefit." Even though he did not intend to obtain an immigration benefit, the government presented sufficient evidence for a jury to conclude that Murry knew Diann did and intended her plan to succeed so that he could reap the monetary marriage benefits from the Army. The district court instructed the jury that under Pinkerton v. United States, 328 U.S. 640 (1946), "a participant in a conspiracy is liable for all of the reasonably foreseeable acts of his coconspirators, provided those acts are committed in furtherance of the conspiracy," even if the defendant did not commit them directly. United States v. Bowen, 527 F.3d 1065, 1078 n.10 (10th Cir. 2008) (citing United States v. Lake, 472 F.3d 1247, 1265 (10th Cir. 2007)). Because the jury found Murry guilty of the conspiracy in count four, he would also be guilty of Diann's reasonably foreseeable acts in furtherance of the conspiracy.

36

Her false statement on the I-751 furthered the conspiracy to obtain green cards. Thus, even if Murry didn't have the relevant intent in making the false statement, Diann did, and a reasonable jury could conclude the evidence was sufficient to convict him under Pinkerton.

The government also charged Murry under the aiding-and-abetting statute. Thus, the jury could find him guilty if he willfully associated himself with the criminal venture and sought its successes through his own action.  United States v. Rosalez, 711 F.3d 1194, 1205 (10th Cir. 2013) (quoting United States v. Jackson, 213 F.3d 1269, 1292 (10th Cir. 2000), judgment vacated on other grounds, 531 U.S. 1033, (2000)) (citing Nye & Nissen v. United States, 336 U.S. 613, 619 (1949)).  The evidence establishes—and a reasonable jury could conclude—that Murry sought to make Diann's venture succeed by marrying her and submitting immigration documents with her.  We thus conclude the jury had sufficient evidence to support Murry's conviction on count two.

Murry next challenges the sufficiency of the evidence on count four for conspiracy.  A conspiracy requires proof "(1) that two or more people agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent." United States v. Small, 423 F.3d 1164, 1182 (10th Cir. 2005) (citing United States v. Evans, 970 F.2d 663, 668 (10th Cir.1992)).

37

Murry argues that the evidence did not show that he shared the conspiracy's objective because he did not intend to obtain immigration benefits for all three of Rajesh, Diann, and Raul. Rather, he argues the Ramcharans orchestrated two conspiracies—one to obtain immigration benefits for Diann and Raul and another for Rajesh. Murry contends that this constituted a prejudicial variation between the evidence the government presented at trial showing multiple conspiracies and the single conspiracy charged in the indictment. "A variance occurs when the conspiracy charged in an indictment is different from the evidence adduced at trial." United States v. Hall, 473 F.3d 1295, 1305 (10th Cir. 2007) (citing United States v. Windrix, 405 F.3d 1146, 1153 (10th Cir. 2005)).

A conspiracy requires a "*shared,* single criminal objective, not just similar or parallel objectives between similarly situated people." Small, 423 F.3d at 1182 (quoting Evans, 970 F.2d at 670). That said, "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy." Id. (quoting United States v. Mendoza–Salgado, 964 F.2d 993, 1005 (10th Cir. 1992)). And the government must "only prove by direct or circumstantial evidence 'that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily became part of it.'" Id. at 1182–83 (quoting Mendoza–Salgado, 964 F.2d at 1005). Here, the indictment charged that the conspiracy's purpose was to obtain lawful immigration for status for Diann, Rajesh, and Raul, that the conspiracy included all five Defendants (including Guevara who pleaded guilty), and that the conspiracy spanned from July 2010 to August 2017. The government presented evidence to establish that Murry voluntarily joined the conspiracy by marrying Diann to

38

help her and Raul obtain immigration benefits in exchange for more money from the Army. The evidence shows that Murry subsequently helped Diann submit immigration forms. Thus, he knew the goal was to help Diann and her family obtain lawful immigration status. That he may not have known Rajesh was also part of the conspiracy does not establish that he did not know its essential objective. Drawing all inferences in the light most favorable to the government, a reasonable jury could have found Murry guilty beyond a reasonable doubt.

Moreover, Murry wrongly contends that two different conspiracies existed to create an impermissible variance. "Distinguishing between a single, large conspiracy and several smaller conspiracies is often difficult; we will generally defer to the jury's determination of the matter." United States v. Caldwell, 589 F.3d 1323, 1329 (10th Cir. 2009); accord United States v. Powell, 982 F.2d 1422, 1431 (10th Cir. 1992) (citing United States v. Dickey, 736 F.2d 571, 581 (10th Cir. 1984)) ("Whether the evidence established a single conspiracy is a fact question for the jury."). To determine whether a variance occurred, the analysis focuses on whether the alleged conspirators' conduct shows that they intended to act together for a shared mutual benefit within the scope of the conspiracy charged. United States v. Hamilton, 587 F.3d 1199, 1208 (10th Cir. 2009) (citing United States v. Edwards, 69 F.3d 419, 432 (10th Cir. 1995); United States v. Heckard, 238 F.3d 1222, 1231 (10th Cir. 2001)). Interdependence requires that "the alleged coconspirators were united in a common unlawful goal or purpose and . . . a defendant's activities facilitated the endeavors of *another alleged coconspirator or facilitated the venture as a whole*." Id. at 1208–09 (quoting United States v. Ailsworth, 138 F.3d 843, 851 (10th Cir. 1998)) (citing

39

United States v. Hutchinson, 573 F.3d 1011, 1036 (10th Cir. 2009)).  Murry married Diann for their mutual benefit— his obtaining money and her immigration status—which facilitated the conspiracy's objective as a whole.  Thus, a reasonable jury could find a single conspiracy.

H.

Eighth, and finally, Harvell contends that the jury lacked sufficient evidence to support his conviction on counts three and four.  Count three charged Harvell with making false statements to government officials in violation 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2.  Count four charged Harvell with conspiracy to commit marriage fraud and make false statements to government officials, in violation of 18 U.S.C. § 371.

Harvell moved for a judgment of acquittal on counts two and three—but not on count four—at the close of the government's case.  "'The Rules of Criminal Procedure do not allow a defendant to wait until appeal' to challenge the sufficiency of the evidence."  United States v. Leffler, 942 F.3d 1192, 1197 (10th Cir. 2019) (quoting United States v. Goode, 483 F.3d 676, 680 (10th Cir. 2007)). !Thus, "a defendant must present claims of insufficient evidence in the first instance to the district court through a motion for a judgment of acquittal."  Id. (citing Goode, 483 F.3d at 680–81; Fed. R. Crim. P. 29).  And when a defendant presents to the district court a sufficiency-of-the-evidence challenge on specific grounds, he waives all grounds not specified in the motion.  Id.  (citing Goode, 483 F.3d at 681).  Because

Harvell moved for a judgment of acquittal on counts two and three but not four, he did not preserve a sufficiency-of-the-evidence challenge to count four on appeal.

The United States Code prohibits "knowingly and willfully . . . mak[ing] or us[ing] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."  18 U.S.C. § 1001(a)(3).  And 18 U.S.C. § 2(a) provides that those who "aid[ ], abet[ ], counsel[ ], command[ ], induce[ ], or procure[ ]" commission of an offense against the United States "[are] punishable as . . . principal[s]."

Harvell first argues the government failed to present sufficient evidence to convict him under count three—making false statements to government officials—because he played no role in submitting Rajesh's Form I-485 application to adjust his status, representing Rajesh's address as Harvell's.  But Harvell's lack of direct involvement does not matter.  The jury could have found him liable as a co-conspirator or as an accomplice. See United States v. Wardell, 591 F.3d 1279, 1291–92 (10th Cir. 2009) ("[P]ursuant to the Pinkerton doctrine, Mr. Wardell was legally responsible for the physical attack on Mr. Cluff, regardless of whether *his* physical acts independently satisfied the technical elements of § 1513(b).").

Second, Harvell argues that the government presented no evidence that he solicited a fake lease for his basement.  But Guevara testified that Harvell agreed to that plan; the evidence revealed Rajesh received mail at Harvell's address; and Harvell spoke to the United States Custom and Immigration Services agents about Rajesh's lease.

41

Third, Harvell asserts that Rajesh's address is immaterial because the lie did not affect his Form I-485's resolution. But a United States Custom and Immigration Services agent testified about a Form I-485 address's importance and how it helps determine a marriage's legitimacy.

Last, Harvell argues that we cannot consider his statements to the immigration agents under the "exculpatory-no doctrine"—an exception to criminal liability under 18 U.S.C. § 1001 for a false statement that consists of the mere denial of wrongdoing. But the "exculpatory-no doctrine" is not good law. Brogan v. United States, 522 U.S. 398, 408 (1998) ("[T]he plain language of § 1001 admits of no exception for an 'exculpatory no' . . . ."). Thus, a reasonable jury could have found Harvell guilty beyond a reasonable doubt.

AFFIRMED.